IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ASH BAKRE, | § | |
| TDCJ #784509, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-3641 |
| | § | |
| DENNIS HUGHES and | § | |
| DR. KOKILA NAIK, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

State inmate Ash Bakre (TDCJ #784509) has filed a complaint under 42 U.S.C. § 1983, alleging violations of his civil rights by two state prison officials (Dennis Hughes and Dr. Kokila Naik). Bakre proceeds *pro se* and he has been granted leave to proceed *in forma pauperis*. After screening all of the pleadings pursuant to 28 U.S.C. § 1915A, the Court requested an answer from Dr. Naik. Pending before the Court is Dr. Naik's motion for summary judgment. [Doc. # 13]. Bakre has filed a response to that motion. [Doc. # 16]. After reviewing all of the pleadings, the summary judgment record, and the applicable law, the Court **grants** the pending motion and **dismisses** this case for reasons that follow.

## I.    BACKGROUND

Bakre is presently in custody of the Texas Department of Criminal Justice - Correctional Institutions Division ("TDCJ") at the Beto I Unit, in Tennessee Colony, Texas, where he is serving a life sentence as the result of a 1997 murder conviction. Bakre sues Dr. Naik, who is a physician employed by the University of Texas Medical Branch ("UTMB")

to provide care to TDCJ inmates.  Dr. Naik is assigned to the Jester III Unit in Richmond, Fort Bend County, Texas, which features a special treatment program for physically handicapped offenders, known as the Physically Handicapped Offenders Program or "PHOP."  Through the PHOP, which offers physical therapy and rehabilitative services, prisoners can be referred to the Brace & Limb Clinic for assorted prosthetics if certain criteria are met.  As discussed more fully below, Bakre complains that Dr. Naik denied him a referral to the Brace & Limb Clinic for medical boots in 2007 and 2008.

According to the pleadings, Bakre reportedly suffers from "weakness" in his right foot.  He also suffers from chronic pain in his lower back or "lumbar spine" and his right hip. Bakre contends that he sustained these injuries during separate use-of-force incidents that occurred while he was incarcerated in 1999 and 2000.

The medical records show that Bakre was placed in the PHOP in 2003, where he was examined by Dr. Naik at the Jester III Unit.  In July of 2003, Dr. Naik determined that Bakre was eligible to receive a pair of "medical boots," under Correctional Managed Care Policy G-59.3, for "Medical Prostheses and Orthotic Devices," because his right leg is longer than his left leg.  As a result, she referred Bakre to the Brace & Limb Clinic, where he was fitted for a "lift" in the heel of his left boot to remedy the discrepancy in leg length.  In July of 2005, Bakre was referred to the Brace & Limb Clinic to receive another pair of medical boots.

In November of 2007, a physician at the Beto I Unit (Dr. Robert Roe) referred Bakre to the Brace & Limb Clinic to receive a new pair of medical boots.  Bakre complains,

however, that Dr. Naik denied this referral.  When Bakre inquired about why the referral was denied, Dr. Naik responded that he did not meet the criteria for a new pair of medical boots.

Bakre reports that, in 2008, three other health care providers (Dr. Howard Clayton, Dr. Maria Angeles, and Nurse Practitioner Mel Wright) issued or recommended a referral to the Brace & Limb Clinic for a new pair of medical boots.  Bakre complains that Dr. Naik denied these referrals as well.  Bakre filed a formal grievance to challenge the Dr. Naik's decision. An investigation confirmed that the referrals were denied because they failed to show that Bakre met new, more restrictive criteria for medical boots found in the revised version of the TDCJ policy governing medical or orthotic footwear (Policy G-59.3), which went into effect in July of 2007.

Bakre argues that, by refusing to approve a referral for new medical boots in 2007 or 2008, Dr. Naik denied him adequate medical care with deliberate indifference to a serious medical need in violation of the Eight Amendment to the United States Constitution.[1]  Bakre seeks compensatory and punitive damages for the violation of his constitutional rights.  Dr. Naik has filed a motion for summary judgment, arguing that Bakre is not entitled to relief. The parties' contentions are discussed further below under the governing standard of review.

## II.    STANDARD OF REVIEW

---

[1]    Bakre also complains that a physical therapist (Dennis Hughes) mistreated him at the Estelle Unit in January of 2006.  The Court did not request an answer from Hughes because, for reasons discussed briefly below, Bakre's allegations against Hughes must be dismissed.

The complaint in this case is governed by the Prison Litigation Reform Act (the "PLRA"), which mandates the dismissal of a prisoner's civil rights complaint under the following circumstances. Upon initial screening of a prisoner civil rights complaint, the PLRA requires a district court to scrutinize the claims and dismiss the complaint, in whole or in part, if it determines that the complaint "is frivolous, malicious, or fails to state a claim upon which relief may be granted;" or "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b). A reviewing court may dismiss a complaint for these same reasons "at any time" where a party proceeds *in forma pauperis*. 28 U.S.C. § 1915(e)(2)(B) (mandating dismissal where the complaint is "frivolous or malicious," "fails to state a claim upon which relief may be granted," or "seeks monetary relief from a defendant who is immune from such relief"). The PLRA also provides that the court "shall on its own motion or on the motion of a party dismiss an action" if it is satisfied that the complaint is "frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." 42 U.S.C. § 1997e(c).

Dr. Naik's motion for summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). The moving party has the burden of showing

that summary judgment is appropriate.  *See Martco Ltd. Partnership v. Wellons, Inc.*, 588 F.3d 864, 871 (5th Cir. 2009) (citing *Celotex*, 477 U.S. at 323).  Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.  56(c)(2); *Celotex Corp.*, 477 U.S. at 322-23.

If the moving party meets its initial burden, "[t]he nonmoving party 'must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim.'"  *Peterson v. City of Forth Worth, Tex.*, 588 F.3d 838, 844 (5th Cir. 2009) (quotation omitted).  "The identified evidence 'must be sufficient to sustain a finding in favor of the nonmovant on all issues as to which the nonmovant would bear the burden of proof at trial.'"  *Id.*  The non-movant must do more than simply show that there is some "metaphysical doubt" as to the material facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,  587 (1986).  "A fact is material only if its resolution would affect the outcome of the action, . . . and an issue is genuine only 'if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.'"  *Wiley v. State Farm Fire and Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009) (internal citation and quotations omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 478 U.S. at 587-88; *Hill v. Carroll County, Miss.*, 587 F.3d 230, 233 (5th Cir. 2009).  However, factual controversies are resolved in

5

favor of the non-movant "only 'when both parties have submitted evidence of contradictory facts.'" *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (quoting *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999)).   The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings.   *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002).   Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden.  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).    Instead, the nonmoving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case." *American Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted).   In the absence of any proof, a reviewing court will not assume "that the non-moving party could or would prove the necessary facts,' and will grant summary judgment 'in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075) (emphasis in original).

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).   "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."   *Id*. (internal citations and quotations omitted).   The Court acknowledges that the plaintiff proceeds *pro*

*se* in this instance.  However, it is well established that "the notice afforded by the Rules of Civil Procedure and the local rules" is considered "sufficient" to advise a *pro se* party of his burden in opposing a summary judgment motion.  *Martin v. Harrison County Jail*, 975 F.2d 192, 193 (5th Cir. 1992).

## III.   DISCUSSION

Bakre's complaint is governed by 42 U.S.C. § 1983.  Section 1983 provides a private right of action for damages to individuals who are deprived of "any rights, privileges, or immunities" protected by the Constitution or federal law by any person acting under the color of state law.  To establish liability under § 1983, a civil rights plaintiff must satisfy two elements:  (1) state action, *i.e.*, that the conduct complained of was committed under color of state law, and (2) a resulting violation of federal law, *i.e.,* that the conduct deprived the plaintiff of rights secured by the Constitution or laws of the United States.  *See Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992); *Baker v. McCollan*, 443 U.S. 137, 142 (1979).

Bakre's primary claim is that Dr. Naik is liable under 42 U.S.C. § 1983, for denying referrals made by several other physicians that would have given him a new pair of medical boots in late 2007 or 2008.  Dr. Naik argues that Bakre fails to establish that he was denied adequate medical care in violation of the United States Constitution and that he is not entitled to relief.  Dr. Naik argues further that she is entitled to immunity from Bakre's claims against

her in her official and personal or individual capacities.[2] Dr. Naik's arguments are addressed in turn below, beginning with the defense of immunity from Bakre's claims against her in her official capacity as a state employee.

### A.    Immunity From Official-Capacity Claims

Dr. Naik is employed by UTMB to provide health care to inmates incarcerated in TDCJ.  It is undisputed that UTMB and TDCJ are agencies of the State of Texas.  As an employee of the State of Texas, Dr. Naik argues that the Eleventh Amendment to the United States Constitution bars any claim for monetary relief against her in her official capacity.

The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.   Federal court jurisdiction is limited by the Eleventh Amendment and the principle of sovereign immunity that it embodies.  *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996); *Vogt v. Board of Comm'rs, Orleans Levee Dist.*, 294 F.3d 684, 688 (5th Cir. 2002).   Unless abrogated or expressly waived, the

---

[2]    Claims under 42 U.S.C. § 1983 may be brought against persons in their individual or official capacity, or against a governmental entity. *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009) (citing *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997)), *cert. denied*, — U.S. —, 2010 WL 154980 (Jan. 19, 2010). "Personal-capacity suits seek to impose liability upon a government official as an individual while official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Goodman*, 571 F.3d at 395 (quoting *Monell v. Dept. of Soc. Serv.'s of City of New York*, 436 U.S. 658, 690 n. 55 (1978)). Thus, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity." *Goodman*, 571 F.3d at 395 (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citation omitted))

"ultimate guarantee of the Eleventh Amendment" is that a non-consenting state may not be sued in federal court by private individuals, including its own citizens. *Board of Trustees of the Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001). This guarantee bars an action in federal court by, *inter alia*, a citizen of a state against his or her own state, including a state agency. *See Regents of the Univ. of California v. Doe*, 519 U.S. 425, 429 (1997); *Martinez v. Texas Dep't of Criminal Justice*, 300 F.3d 567, 574 (5th Cir. 2002).

In this case, Bakre sues Dr. Naik for actions taken during the course of her employment with UTMB on behalf of TDCJ. As agencies of the State of Texas, both UTMB and TDCJ are immune from a suit for money damages under the Eleventh Amendment. *See Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998). It is settled that the Eleventh Amendment also bars a recovery of money damages under 42 U.S.C. § 1983 from state employees in their official capacity. *See Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2001); *Aguilar v. Texas Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998). To the extent that Bakre seeks monetary damages in this case, the Eleventh Amendment bars his claims against Dr. Naik as a state employee.[3] It follows that Dr. Naik is entitled to immunity under the Eleventh Amendment from Bakre's claims for monetary damages against her in her official capacity.

### B.    Qualified Immunity From Individual-Capacity Claims

---

[3]    A narrow exception to Eleventh Amendment immunity exists for suits brought against individuals in their official capacity, as agents of the state or a state entity, where the relief sought is injunctive in nature and prospective in effect. *See Aguilar*, 160 F.3d at 1054 (citing *Ex parte Young*, 209 U.S. 123 (1980)). Bakre also seeks injunctive relief in this case. However, because Bakre concedes that he received a new pair of medical boots on July 16, 2009 [Doc. # 15], his claim for injunctive relief has become moot.

Dr. Naik argues further that judgment as a matter of law is appropriate because, as a public employee, she is entitled to qualified immunity from Bakre's claims.  Under the doctrine of qualified immunity, public officials and employees acting within the scope of their authority are shielded "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Qualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, — U.S. —, 129 S. Ct. 808, 815 (2009).  The Supreme Court has characterized the doctrine as protecting "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

To determine whether a public official is entitled to qualified immunity for an alleged constitutional violation, reviewing courts typically conduct a two-prong analysis that was established in *Saucier v. Katz*, 533 U.S. 194 (2001), *overruled in part by Pearson*, — U.S. —, 129 S. Ct. at 817.  The first prong of the *Saucier* analysis asks whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the official's conduct violated a constitutional right.  *See Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769, 1774 (2007) (citing *Saucier* 533 U.S. at 201).  "If, and only if, the court finds a violation of a constitutional right, 'the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case.'"  *Id.* (quoting *Saucier*, 533 U.S.

at 201).  If there is evidence to support the violation of a constitutional right, the second prong of the *Saucier* analysis asks whether qualified immunity is appropriate, nevertheless, because the defendant's actions were objectively reasonable "in light of clearly established law at the time of the conduct in question." *Hampton Co. Nat'l Sur., L.L.C. v. Tunica County, Miss.*, 543 F.3d 221, 225 (5th Cir. 2008) (quoting *Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir. 2007)).

The Supreme Court has recently clarified that the two-prong protocol established in *Saucier*, while often appropriate, is no longer mandatory for resolving all qualified immunity claims.  *Pearson*, 129 S. Ct. at 818.  Reviewing courts are permitted "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.*  Thus, the "rigid *Saucier* procedure" need not be followed in any particular sequence.  *Id.*  In this case, the Court finds it appropriate to determine initially whether a constitutional violation occurred under the traditional two-step procedure established in *Saucier*.

Before conducting the *Saucier* inquiry, the Court pauses to note that the usual summary judgment burden of proof is altered in the case of a qualified immunity defense. *See Gates v. Texas Dep't of Protective and Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008).  An official need only plead his good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law.  *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005) (citing *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)).  The plaintiff

11

bears the burden of negating the defense and cannot rest on conclusory allegations and assertions, but must demonstrate genuine issues of material fact regarding the reasonableness of the official's conduct. *Michalik*, 422 F.3d at 262; *see also Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009) (noting that, to avoid summary judgment on qualified immunity, a plaintiff need not present "absolute proof, but must offer more than "mere allegations") (quotation omitted).

At the summary judgment stage of this case, a determination whether a constitutional right was violated for purposes of the first prong of the qualified immunity analysis overlaps substantially with Dr. Naik's contention that Bakre's claim (that he was denied adequate medical care) lacks merit.  Accordingly, the Court first addresses whether Bakre has raised a genuine issue of material fact on whether he was denied adequate medical care under the governing standard found in the Eighth Amendment to the United States Constitution, which prohibits cruel and unusual punishment.

### 1.    Eighth Amendment — Denial of Adequate Medical Care

Bakre, a state prison inmate, complains that Dr. Naik denied him adequate medical care in violation of the Eighth Amendment.  "Although the Eighth Amendment 'does not, by its precise words, mandate a certain level of medical care for prisoners[,]' the Supreme Court has interpreted it as imposing a duty on prison officials to 'ensure that inmates receive adequate . . . medical care.'" *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  "A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when his conduct

demonstrates deliberate indifference to a prisoner's serious medical needs, constituting an 'unnecessary and wanton infliction of pain.'" *Easter*, 467 F.3d at 463 (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (quoting *Estelle v. Gamble*, 429 U.S. 97 (1976)).

The Eighth Amendment deliberate-indifference standard has both an objective and subjective component. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To establish deliberate indifference under this standard, the prisoner must show that (1) the defendants were aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn, and (2) that they actually drew an inference that such potential for harm existed. *See id.* at 837; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999). The Fifth Circuit has stated that the deliberate-indifference standard is an "extremely high" one to meet. *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). "A prison official acts with deliberate indifference 'only if [(A)] he knows that inmates face a substantial risk of serious bodily harm and [(B)] he disregards that risk by failing to take reasonable measures to abate it.'" *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (quoting *Farmer*, 511 U.S. at 847). "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Id.* (citations omitted). A showing of deliberate indifference requires the prisoner to submit evidence that prison officials "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Id.* (citations omitted).

As noted above, Bakre complains that Dr. Naik denied him adequate medical care when she rejected or refused to approve several referrals that were made on Bakre's behalf for a new pair of medical boots from the Brace & Limb Clinic. In support of her argument that Bakre fails to demonstrate an Eighth Amendment violation, Dr. Naik has presented an affidavit from Dr. Glenda M. Adams, who is employed as the Inpatient Services Medical Director for UTMB Correctional Managed Health Care. [Doc. # 13, Exhibit D]. Prior to her current position, Dr. Adams worked for eight years as a primary care physician for TDCJ, from 1987 through 1995, where she had "extensive experience in assessing [the medical needs of prisoners] and making appropriate referrals to specialty services," including the Brace & Limb Clinic. Dr. Adams also worked for three years, from 1995 through 1998, as a supervisor in which she was responsible for reviewing and approving or disapproving referrals for specialty clinic services, such as those provided by the Brace & Limb Clinic. In addition to Dr. Adams' affidavit, Dr. Naik has also presented a copy of the applicable prison policy governing Medical Prostheses and Orthotic Devices (Policy G-59.3), along with relevant portions of Bakre's grievance records, medical records, and classification records. [Doc. # 13, Exhibits A, B, C, and E]. Bakre's medical condition and his treatment history is summarized below.

The medical records reflect that Bakre is a 52-year-old male who has had longstanding problems with his spine and his right hip. These records mention that, at some undisclosed point prior to his incarceration, Bakre was in a plane crash that resulted in a "cervical spine fracture" of the C5 vertebrae. [Doc. # 13, Exhibit A, at 2; Doc. # 16, Exhibit A2(a)]. The

14

records also document that Bakre's mobility is limited, that he walks with a cane, and that he has received extensive treatment for multiple orthopedic or "musculoskeletal" problems. [Doc. # 13, Exhibit A, at 2-30; Doc. # 16, Exhibit A, at 2-27].  Dr. Adams observes that Bakre suffers from "significant degenerative joint disease" in his neck and back.  [Doc. # 13, Exhibit D, at 1].  She notes that, in 1999, Bakre underwent surgery to fuse multiple levels of his cervical spine, which required a bone graft and hardware for stabilization.[4]  [*Id.*].  Dr. Adams notes further that Bakre suffers from "chronic low back discomfort" due to arthritis and disk disease.  [*Id.*].  He also has "minimal early arthritis" of his right hip and knee. [*Id.*].

As a result of Bakre's physical limitations, he is "medically unassigned" for purposes of a prison work detail.  [Doc. # 13, Exhibit E, at 3].  To the extent that he can function, Bakre is limited to "sedentary work only."  [*Id.*].  Other restrictions include limitations on excessive standing, walking for more than 250 yards, lifting more than 10 pounds, climbing, sitting for great lengths of time, and "reaching over the shoulder."  [*Id.*].  Bakre is also restricted from performing tasks that require repetitive use of the hands or walking on wet and uneven surfaces.  [*Id.*].  Bakre's housing assignment limits him to a cell block on the "ground floor only" and he is restricted to a "lower" bunk.  [*Id.*].

---

[4]     The "cervical spine," which pertains to the neck, is "that portion of the spine comprising the cervical vertebrae."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 339, 1775 (31st ed. 2007).  "[S]pinal fusion in the cervical region [is done] to correct instability when traumatic vertebral fractures do not heal with other techniques."  *Id.* at 763 (containing an x-ray illustration of "spinal fusion with plate fixation").

Dr. Adams observes that, on July 17, 2003, Dr. Naik evaluated Bakre in her role as a "physiatrist" with the Brace & Limb Clinic.[5]  [Doc. # 13, Exhibit D, at 2].  During this examination, Dr. Naik noted that Bakre had "functional strength in all extremities," but that he had degenerative joint disease in his right knee.  [*Id.*, Attachment A].  Dr. Naik instructed Bakre on the proper use of a cane.  [*Id.*].  Dr. Naik observed that Bakre had a discrepancy in the length of his legs.  [*Id.*].  In that respect, she found that Bakre's left leg was 3/8 of an inch shorter than his right leg.  [*Id.*].  To remedy the "leg length discrepancy," Dr. Naik authorized a new pair of medical boots or shoes for Bakre with a 3/8 inch "lift" in the left heel.  [*Id.*].  She also noted that Bakre had a "fairly good ability to walk," but that he needed housing close to the medical department, the chow hall, and the showers.  [*Id.*].

On July 13, 2005, a physical therapist who worked as Dr. Naik's assistant (James Bjornson) evaluated Bakre's condition.  [Doc. # 13, Exhibit D, at 2].  Bjornson determined that Bakre did not need to see a specialist, but he ordered a new pair of medical boots for Bakre.  [Doc. # 13, Exhibit A, at 6].  These boots also featured a 3/8 inch lift in the left heel.  [*Id.*].

On November 30, 2007, a physician at the Beto Unit (Dr. Robert Roe) issued a referral for Bakre for a new pair of medical boots from the Brace & Limb Clinic.  [Doc. # 13,

---

[5]    A "physiatrist" is a medical doctor or physician who specializes in physiatry, which is "the branch of medicine that deals with the prevention, diagnosis, and treatment of disease or injury, and the rehabilitation from resultant impairments and disabilities, using physical agents, such as light, heat, cold, water, electricity, therapeutic exercise, and mechanical apparatus, and sometimes pharmaceutical agents." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1464 (31st ed. 2007).

Exhibit C, at 6].[6]  Dr. Naik denied the referral in December of 2007, after determining that Bakre did not meet the criteria for medical boots under the applicable version of the policy on Medical Prostheses and Orthotic Devices (Policy G-59.3), which had been revised in July of 2007.  [Doc. # 13, Exhibit D, at 2].

The medical records show that, in 2008, Bakre was examined by several other doctors regarding his requests for a new pair of medical boots.  An unidentified consulting physician saw Bakre at the UTMB Hospital on February 14, 2008, regarding his "multiple spine complaints."  [Doc. # 13, Exhibit A, at 6].  Noting that Bakre had "neck and back pain," this physician planned to refer him to "neurosurgery" and also requested an evaluation for "medical boots."  [*Id.* at 6-8].  Thereafter, on or about March 27, 2008, Dr. Harold Clayton saw Bakre at the Beto I Unit, where he signed a referral for medical boots.  [Doc. # 13, Exhibit A, at 9].  Dr. Naik denied Dr. Clayton's referral, however, because it did not include any supporting information or medical justification.  [Doc. # 13, Exhibit D, at 2].

Dr. Clayton saw Bakre at the Beto I Unit again on May 12, 2008.  [*Id.* at 10].  At this time, Dr. Clayton issued another referral for medical boots.  [*Id.*].  Dr. Naik denied this referral as well, however, because it was unaccompanied by any documentation showing that Bakre met the criteria under the governing policy for medical boots.  [Doc. # 13, Exhibit D, at 2].

---

[6]     The referral from Dr. Roe indicated that Bakre's right leg is about 3/4 inch shorter than his left.  Dr. Adams notes that this assessment, which appears to be no more than a "visual estimate," is incorrect because the medical records show that it is Bakre's left leg that is shorter than his right.  [Doc. # 13, Exhibit D, at 3, n.2].  When reviewing the referral, Dr. Naik reviewed Bakre's medical records and confirmed that his left leg is shorter by only 3/8 of an inch.  [*Id.*].

17

Thereafter, Bakre received treatment at the UTMB Hospital in Galveston, where he was examined by a neurosurgeon (Dr. Maria Angeles) for complaints of pain in his right hip. [Doc. # 13, Exhibit D, at 2]. Dr. Angeles saw Bakre on May 14, 2008, and July 30, 2008, but there is no mention in the records of any request or referral for medical boots. [Doc. # 13, Exhibit A, at 12-14, 19-20]. Dr. Angeles saw Bakre again in the "tele-med clinic" on August 13, 2008, for right hip pain.[7] [Doc. # 13, Exhibit D, Attachment F]. Records of the examination show that an MRI of Bakre's lumbar spine was normal and that his right hip pain was located at the site of a prior bone graft, not at the hip joint. [*Id.*]. The records include a notation which states "Brace & Limb unit for medical boots," but there is no explanation or medical justification provided. [*Id.*]. Likewise, contrary to Bakre's allegation, there is no record showing that Dr. Angeles made a formal referral for medical boots.

On August 28, 2008, Nurse Practitioner Mel Wright saw Bakre at the Beto I Unit clinic, where he complained of hip pain. [Doc. # 13, Exhibit A, at 25]. At that time, Wright submitted a referral for prosthetics or medical boots on Bakre's behalf. [Doc. # 13, Exhibit

---

[7]     In collaboration with UTMB and Texas Tech University Health Sciences Center, TDCJ has developed a telemedicine program that uses video conferencing as a way to cut prisoner health care costs. *See* Ben G. Raimer, M.D. and John D. Stobo, M.D., Health Care Delivery in the Texas Prison System: The Role of Academic Medicine, 292 Journal of the American Medical Association 485 (July 28, 2004); *see also* Roman J. Kupchynsky and Cheryl S. Camin, Legal Considerations of Telemedicine, 64 Tex. Bar J. 20, 27 (2001) (identifying UTMB and Texas Tech Healthnet as two of the top telemedicine programs and reporting that UTMB in Galveston "was able to cut costs for care rendered to prison inmates by providing services via telemedical consultations").

D, Attachment G].  Dr. Naik reviewed the referral and requested additional information.
After Wright failed to provide any, Dr. Naik denied the referral on September 8, 2008.

On September 12, 2008, Bakre filed a Step 1 grievance, complaining that Dr. Naik
improperly denied the referrals for a new pair of medical boots.  [Doc. # 13, Exhibit C].  A
grievance investigator reviewed the medical documentation and found that the referrals were
denied because Bakre "does not meet the criteria" for medical boots under the governing
policy. [*Id.* at C3-C4].  As the response to the Step 1 grievance indicates, the record shows
that Dr. Naik denied the referrals made by Dr. Roe on November 30, 2007, and by Dr.
Clayton on March 27, 2008, and May 12, 2008, because the policy on the issuance of
medical boots changed in July of 2007.  Dr. Naik provides a copy of Policy G-59.3, which
is entitled "Medical Prostheses and Orthotic Devices."  [Doc. # 13, Exhibit B].  Under this
policy, "[o]ffenders who have been identified by treating providers with medical conditions
that impair their performance of major functional activities will be referred to Brace and
Limb Clinic for evaluation and appropriate treatment by Rehabilitation Services Staff." [*Id.*].
Prior to July of 2007, a prisoner in TDCJ could qualify for orthotic footgear if one of his legs
was 3/8 of an inch shorter than the other.  [*Id.*].  After July of 2007, however, the policy
became more restrictive.  Under the new policy, a leg length discrepancy of ½ inch or less
is considered to be "mild enough" to be handled by primary care providers at the unit level
and no longer qualifies an individual for orthotic footgear.  [Doc. # 13, Exhibit B, Policy G-
59.3, Attachment A].  Because Bakre's medical records documented a leg length discrepancy

of only 3/8 of an inch, he did not qualify for medical boots under the revised version of the policy.

Unsatisfied with the response to his Step 1 grievance, Bakre filed a Step 2 grievance on September 17, 2008, complaining that Dr. Naik wrongfully denied the referrals for medical boots.  [Doc. # 13, Exhibit C at 14-15].  In response, an administrative official explained the change in policy to Bakre. [*Id*. at 15].  The official also advised Bakre that his primary health care providers were free to disagree and that they could file an appeal from the adverse decision on Bakre's behalf:

> An investigation has been completed regarding the complaint that Dr. Naik denied an order for medical boots.  Clinical documentation and the Step 1 response indicate you were referred to Prosthetic Speciality Clinic on 11/30/2007, but the referral was denied due to criteria not being met.  The response further advised you of referrals made on 3/27/2008 and 5/12/2008 and both denied due to your condition not meeting the criteria.  Further investigation of your medical reason reflects another referral by a provider on 09/03/2008 and it has also been denied.
>
> Although you and your health care providers may differ in opinion regarding your needs and the medical treatment rendered, these decisions are their responsibility.  Be aware that guidelines for orthotic footwear are subject to change.  Please refer to CMHC Policy G-59.3 for information regarding orthotic devices.  Also, there is a process in place which may be utilized for an appeal when a referral is not approved; however, it is the decision of the health care provider at the facility level to initiate an appeal.  If you feel that your medical condition has changed to warrant further evaluation, you may submit a Sick Call Request to the facility medical department. . . .

[*Id.*].  As Dr. Adams notes, there is no evidence showing that Bakre's health care providers filed an appeal from any of Dr. Naik's decisions regarding the referrals for medical boots that were made in 2007 or 2008.

In addition to the medical records of his treatment, Dr. Naik presents evidence showing that Bakre's condition did not qualify as a serious medical need. In her affidavit, Dr. Adams explains that "[m]ost individuals have some degree of leg length discrepancy." [Doc. # 13, Exhibit D, at 2]. She notes that there are "multiple theories" about whether such discrepancies are congenital, postural, or due to an imbalance of hip muscle strength. [*Id.*]. Dr. Adams reports further that "[t]here is also much debate among experts as to how much of a difference in leg length is significant enough to require special shoes and/or heel lifts." [*Id.*]. Dr. Adams cites *Wheeless' Textbook of Orthopaedics*, as an example of a standard text "that supports the premise that leg length discrepancies of less than ½ inch require no treatment." [*Id.*].

Dr. Naik argues further that, based on the medical records, she was not deliberately indifferent to a serious medical need because the referrals were appropriately denied pursuant to the change in prison policy. Dr. Adams confirms that none of the referrals at issue in this case were supported by documentation showing that Bakre had a discrepancy in the length of his legs that exceeded the ½ inch criteria found in Policy G-59.3. [Doc. # 13, Exhibit D, at 2-3]. Absent a showing that the referrals to Brace & Limb Clinic were medically justified, Dr. Adams maintains that Dr. Naik's decisions were appropriate. [*Id.*]. Dr. Adams observes further that none of the referring providers ever contacted Dr. Naik directly and none of them appealed Dr. Naik's decision to deny a particular referral. [*Id.* at 3].

In conclusion, Dr. Adams notes that Bakre has been placed in the Physically Handicapped Offender Program and has received several courses of physical therapy for his

degenerative joint disease.  [Doc. # 13, Exhibit D, at 3].  He has also been provided "various assistive devices to help him with his activities of daily living." [*Id.*].  As his classification records show, Bakre is not required to work, stand, or walk for any length of time.  After reviewing Bakre's records, Dr. Adams states that "Dr. Naik appears to have provided [Bakre] conscientious and competent care." [*Id.*].  According to Dr. Adams, "[t]here is *no* evidence of any conspiracy to deny [Bakre] care," as he alleges in his pleadings.  [*Id.*].  Dr. Adams states further that there is no evidence of patient mistreatment, abuse of authority, or deliberate indifference to Bakre's serious medical needs.  [*Id.*].

The record supports Dr. Adams's conclusion that Bakre has received ample care from the medical personnel at his facility of assignment and from specialists at the UTMB Hospital in Galveston.  Based on this record, Bakre fails to show that was denied adequate care for a serious medical condition or that Dr. Naik violated his constitutional rights by finding that he failed to qualify for medical boots under the new policy.  To the extent that Bakre disagrees with the level of care that he received, the Fifth Circuit has held repeatedly that mere disagreement with medical treatment does not state a claim for deliberate indifference to serious medical needs under the Eighth Amendment.  *See Stewart v. Murphy*, 174 F.3d 530, 535 (5th Cir. 1999); *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997); *Spears v. McCotter*, 766 F.2d 179, 181 (5th Cir. 1985); *Young v. Gray*, 560 F.2d 201, 201 (5th Cir. 1977).

Even if a lapse in professional judgment occurred, any such failure amounts to mere negligence or malpractice, and not a constitutional violation.  *See Harris v. Hegman*, 198

F.3d 153, 159 (5th Cir. 1999) (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)).   It is well established that allegations of unsuccessful medical treatment, acts of negligence, or medical malpractice "do not constitute deliberate indifference[.]" *Gobert*, 463 F.3d at 347 (citations omitted).   Thus, allegations of negligence and medical malpractice will not suffice to demonstrate an Eighth Amendment claim.   *See Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001); *see also Stewart*, 174 F.3d at 534 ("[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not.").

Viewing all of the evidence in the light most favorable to the plaintiff, as non-movant, Bakre does not show that he was denied care and he does not otherwise demonstrate that Dr. Naik refused care or that she intentionally treated him incorrectly with wanton disregard for a serious medical condition.   *See Domino,* 239 F.3d at 756.   Bakre's allegations concerning the level of care that he received are not sufficient to raise a genuine issue of material fact on whether he was treated with deliberate indifference and they do not articulate a violation of the Eighth Amendment.[8]   Because Bakre fails to establish a constitutional violation in

---

[8]      Bakre reports that a referral to the Brace & Limb Clinic was later approved, and he received a new pair of medical boots on July 16, 2009.  [Doc. # 16, Plaintiff's Reply, at 9 & Exhibit A26].   The summary judgment motion was filed on July 9, 2009, and does not contain any information regarding any new referrals for medical boots.  [Doc. # 13].   To the extent that Bakre complains that he was denied adequate care as the result of a delay in receiving medical boots, he does not demonstrate that the delay resulted in substantial harm. *See Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993) ("[I]n order to maintain a viable claim for delayed medical treatment there must have been deliberate indifference, which results in . . . substantial harm.") (internal citations omitted)).   Because Bakre fails to otherwise establish deliberate indifference on Dr. Naik's part, the Court does not address this issue further.

connection with Dr. Naik's decision to deny the referrals for medical boots, she is entitled to qualified immunity under the first prong of the *Saucier* analysis.  More importantly, Bakre fails to show that relief is warranted under 42 U.S.C. § 1983.  Accordingly, Dr. Naik is entitled to summary judgment in her favor on these issues.

### 2.    Objective Reasonableness

Because Bakre has failed to establish a constitutional violation, the Court need not proceed to the second part of the qualified immunity analysis.  *See Hathaway v. Bazany*, 507 F.3d 312, 320 (5th Cir. 2007).  Nevertheless, Dr. Naik argues that, even if there was a constitutional violation, she is entitled to qualified immunity from suit nevertheless because she acted in good faith and her conduct was objectively reasonable under the circumstances. In support, Dr. Naik emphasizes that she denied Bakre's referrals to the Brace & Limb Clinic in 2007 and 2008 because the physicians who made those recommendations failed to document the referrals in such a way as to show that he met the criteria for medical boots under the revised version of Policy G-59.3.

In support, Dr. Naik points to the affidavit from Dr. Glenda Adams.  In that affidavit, Dr. Adams concludes that Dr. Naik's decision to deny the referrals were made in compliance with Policy G-59.3 and that her actions were both reasonable and appropriate under the circumstances:

> Dr. Naik consistently followed Correctional Managed Care Policy.  The various recommendations and/or referrals to Brace and Limb failed to document that [Bakre] met criteria for medical shoes/boots and none offered arguments as to why [Bakre] should be an exception to established policy. Dr. Naik's decisions to deny these referrals were both reasonable and consistent

24

with what another reviewer given the same information would have reasonably done.

[Doc. # 13, Exhibit D, at 3-4].  Dr. Naik argues that, because her actions were objectively reasonable under the circumstances, she is entitled to qualified immunity in this instance.

To avoid summary judgment on the defense of qualified immunity, a plaintiff must present evidence to raise a fact issue "material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing law *and facts available to them*."  *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993), *cert. denied*, 511 U.S. 1019 (1994) (emphasis added).  If reasonable public officials could differ as to whether the defendant's actions were lawful, then the defendant is entitled to immunity.  *See Malley*, 475 U.S. at 341 (1986).  "Even if a defendant's conduct actually violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity if the conduct was objectively reasonable."  *Zarnow v. City of Wichita Falls, Tex.*, 500 F.3d 401, 408 (5th Cir. 2007) (quoting *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990)).

In his response to the summary judgment motion, Bakre insists that Dr. Naik's actions were unreasonable and that she intentionally denied him a new pair of medical boots.  Where qualified immunity is asserted, Bakre, as the plaintiff, has the burden to produce admissible evidence that raises a genuine issue of material fact on whether the defendant's actions were objectively unreasonable under the circumstances in view of existing law and the facts known to them.  *See Michalik*, 422 F.3d at 262.  Bakre's unsupported allegation that he was intentionally denied care is not sufficient to meet that burden.

It is undisputed that the prison policy governing the provision of medical boots (Policy G-59.3) changed and became more restrictive in July of 2007. Bakre does not demonstrate that any of the referrals at issue included the required documentation showing that he fit within the criteria for medical boots under the revised version of the policy. More importantly, the medical records reflect that Bakre continued to receive care during this time and that his complaints were not being ignored. Under these circumstances, Bakre does not raise a genuine issue of material fact or otherwise show that Dr. Naik's actions were objectively unreasonable. Likewise, Bakre's allegations are not sufficient to overcome Dr. Naik's assertion of qualified immunity. The Court concludes, therefore, that Dr. Naik is entitled to summary judgment on the defense of qualified immunity.

## C.      Remaining Defendant Dennis Hughes

The remaining defendant in this case is Dennis Hughes. According to the pleadings, Hughes was employed by TDCJ as a physical therapist at the Estelle Unit, where Bakre was assigned in 2006. Bakre explains that he was performing a series of exercises during a physical therapy session on January 4, 2006, when Hughes verbally abused and insulted another prison employee (Kathy Pitcock) in an unprofessional manner. A few days later, on January 10, 2006, Bakre claims that Hughes improperly applied a TENS unit to his lower spine,[9] which resulted in an electric current that exceeded "its maximized charge point," sending a shock through Bakre's body. Bakre complains that Hughes tried to electrocute

---

[9]      "TENS" is an abbreviation for "transcutaneous electrical nerve stimulation." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1905 (31st ed. 2007).

him.  Later, on January 18, 2006, after Bakre completed a session on the stationary bike and tread mill, Hughes made him perform some floor exercises on a "'padded' stretcher bed" that had an unclean pillowcase.  When Bakre objected, he claims that Hughes threatened to take away his medical boots.

Based on this record, Bakre's civil rights claims against Hughes stems from incidents that occurred in January and February of 2006.  Civil rights claims brought under 42 U.S.C. § 1983 are governed by the two-year statute of limitations provided by Texas law.  *See Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001); TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a).  This means that once the claims accrued the plaintiff had two years to file a civil rights complaint concerning these allegations.  *See Gonzalez v. Wyatt*, 157 F.3d 1016, 1020 (5th Cir. 1998) (noting that a cause of action accrues, so that the two-year statute of limitations begins to run, when the plaintiff knows or has reason to know of the injury which is the basis of the action).

Bakre attempts to claim that he did not learn of the facts surrounding his complaint against Hughes until he received "vigorous assistance" from a medical records technician at the Beto I Unit on August 22, 2008.  Bakre's allegations demonstrate, however, that he was present during the time he was reportedly abused by Hughes at the Estelle Unit in January and February of 2006.  The record shows that Bakre did not formally complain about Hughes's conduct until he filed a grievance on September 2, 2008.  [Doc. # 13, Exhibit C at 2-3].  TDCJ officials rejected Bakre's grievance against Hughes on October 16, 2008, as untimely filed.  [*Id.* at 15].  The complaint in this case, which is dated December 4, 2008,

also falls well outside the two-year limitations period for the allegations that form the basis of Bakre's claims against Hughes.[10]

Claims brought that are plainly barred by the applicable statute of limitations are subject to dismissal as frivolous under 28 U.S.C. § 1915(e)(2)(B)(i).  *See Gartell v. Gaylor*, 981 F.2d 254, 256 (5th Cir. 1993).  Because Bakre waited more than two years to file suit from the time his claims accrued, his complaint against Hughes is untimely and subject to dismissal as frivolous.[11]  *See id.*  Accordingly, the Court dismisses Bakre's complaint against Hughes as frivolous for purposes of 28 U.S.C. § 1915(e)(2)(B).


**IV.    CONCLUSION AND ORDER**

Based on the foregoing, the Court **ORDERS** as follows:

1.     The motion for summary judgment by Dr. Kokila Naik [Doc. # 13] is

        **GRANTED** and the complaint against her is **DISMISSED** with prejudice.

---

[10]    The Clerk's Office received the complaint on December 12, 2008, and it was filed the same day. Under the mail-box rule, courts treat the date that a *pro se* prisoner deposits his pleadings in the mail as the filing date. *See Fisher v. Johnson*, 174 F.3d 710, 712 n.8 (5th Cir. 1999) (citing *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998) (per curiam)). Because the pleadings are dated December 4, 2008, the complaint could not have been filed before that day.

[11]    Bakre notes that he was transferred from the Estelle Unit in March of 2006. Bakre believes, nevertheless, that Hughes somehow "conspired" with Dr. Naik to deny him a pair of medical boots in 2007 and 2008. As noted above, Dr. Naik denied the referrals at issue in this case because of a change in prison policy that occurred in July of 2007. Bakre's bare allegations are not sufficient to articulate a claim of federal conspiracy under 42 U.S.C. § 1983. *See Brinkmann v. Johnston*, 793 F.2d 111, 113 (5th Cir. 1986) (citing *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982)). Because his conclusory allegations fail to state a claim, the Court does not address this issue further.

2.      The plaintiff's claims against the remaining defendant, Dennis Hughes, are

**DISMISSED**, with prejudice, as frivolous for purposes of 28 U.S.C.

§ 1915(e)(2)(B).

The Clerk is directed to provide a copy of this order to the parties.

SIGNED in Houston, Texas, on <u>January 26th                    </u>, 2010.

Nancy F. Atlas
United States District Judge